# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: May 6, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*
JORDAN HOSPEDALES,                  \*
                                    \*
      Petitioner,                 \*       No. 19-1588V
                                    \*
v.                                  \*       Special Master Young
                                    \*
SECRETARY OF HEALTH                 \*
AND HUMAN SERVICES,                 \*
                                    \*
      Respondent.                 \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*

*Emily Beth Ashe*, Anapol Weiss, Philadelphia, PA, for Petitioner.
*Emily Hanson*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On October 11, 2019, Jordan Hospedales ("Petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program ("the Program").[2] Pet., ECF No. 1. Petitioner alleged that he suffered from "Guillain-Barré Syndrome ("GBS")[3] as a result of receiving a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine on April 13, 2018. *Id.*

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] GBS is "a rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." *Guillain-Barré Syndrome*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=110689 (hereinafter, "DORLAND'S"). "It begins with paresthesias of the feet, followed by flaccid paralysis of the entire lower limbs, ascending to the trunk, upper limbs, and face; other characteristics include slight fever, bulbar palsy, absent or lessened tendon reflexes, and increased protein in the cerebrospinal fluid without a corresponding increase in cells." *Id.*

A careful analysis and weighing of all the evidence and testimony presented in this case in accordance with the applicable legal standards[4] reveals that Petitioner has failed to provide preponderant evidence that he suffered a vaccine-related injury for more than six months. Accordingly, the petition must be dismissed.

## I.    Procedural History

Petitioner filed his petition and medical records on October 11, 2019. Pet.; Pet'r's Exs. 1–3, ECF No. 5. Petitioner filed an affidavit on October 18, 2019. Pet'r's Ex. 4, ECF No. 7.  On December 20, 2019, Respondent filed a status report regarding the completeness of Petitioner's record. ECF No. 12. Respondent requested Petitioner file medical records demonstrating he suffered residual symptoms of his injury for at least six months along with insurance benefits statements. *Id.* On April 22, 2020, Petitioner filed medical records. Pet'r's Exs. 5–6, ECF No. 14. On May 27, 2020, Petitioner filed an affidavit attesting to his employment/educational history and insurance information. Pet'r's Ex. 7, ECF No. 16. On August 13, 2020, Respondent filed a status report indicating Petitioner's record was still not complete. ECF No. 18. Respondent stated Petitioner had not filed any pre-vaccination records or any records showing he suffered residual effects of his injury for more than six months. *Id.* at 1–3. "Despite the passage of almost eight months and numerous requests to do so, [P]etitioner has not filed any records showing that [P]etitioner's alleged residual effects of his GBS lasted beyond 41 days post-vaccination." *Id.* at 3. Respondent indicated he intended to file a motion to dismiss the case for not meeting the six-month statutory requirement. *Id.*

On November 24, 2020, Respondent file a motion for an order to show cause. ECF No. 19. Respondent argued Petitioner had not provided evidence that he suffered residual symptoms of his injury for six months, a requirement necessary for Petitioner's *prima facie* case. *Id.* at 1, 3. "In the interest of judicial efficiency, this factual issue should be resolved before the parties address the issue of vaccine causation." *Id.* at 3. Respondent therefore requested that the special master "issue an Order to Show Cause directing [P]etitioner to demonstrate that he can overcome the present evidentiary deficiency with regard to the required sequelae." *Id.* Petitioner filed an affidavit from himself and his roommate on December 7, 2020. Pet'r's Exs. 8–9, ECF No. 20. Petitioner filed a response to Respondent's motion on December 8, 2020. ECF No. 21. Petitioner stated that his early medical records "document 41 days of sequelae following his GBS diagnosis. However, because Petitioner [was subsequently] unable to afford health insurance and/or pay for medical treatment, he was generally unable to treat with healthcare providers that would document his ongoing GBS sequelae." *Id.* at 2–3. Petitioner believed a March 6, 2020 visit indicating Petitioner had "constipation problems since being diagnosed with [GBS]," and an April 28, 2019 visit noting GBS in the past medical history were proof of Petitioner's GBS sequalae. *Id.* at 3. Respondent filed a reply on December 15, 2020, maintaining his position, renewing his request for an order to

---

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

show cause, or permission to file a motion to dismiss with the evidence currently in the record. ECF No. 22 at 2.

On January 26, 2021, I issued an order giving Petitioner one "final opportunity to address the record's deficiencies." ECF No. 24 at 3. I ordered Petitioner to file military records, evidence of continued numbness and tingling, evidence that constipation is sequala of GBS, and a status report addressing Respondent's assertions. *Id.* at 3–4. Petitioner filed military records on February 9 and February 23, 2021. Pet'r's Exs. 10–11, ECF Nos. 25–26. On March 11, 2021, Petitioner filed an expert report from Frederick Nahm, M.D., Ph.D., and medical literature in support of constipation being sequala of GBS. Pet'r's Exs. 12–12.4, ECF No. 28. On March 12, 2021, Petitioner filed a status report addressing the remaining concerns. ECF No. 29. On May 7, 2021. Respondent filed a status report maintaining his position. ECF No. 31. On July 13, 2021, I issued an order denying Respondent's motion for an order to show cause. ECF No. 32. Based on Petitioner's filings, I found that there was evidence to support Petitioner's claim that he suffered GBS sequelae for more than six months. *Id.* at 1. However, I noted that Petitioner still must "prove by a preponderant standard that his symptoms were sequalae of his vaccine and that said symptoms lasted at least six months." *Id.* at 1–2.

On September 13, 2021, Petitioner filed an expert report on causation from Dr. Nahm and medical literature. Pet'r's Exs. 13–13.24, ECF No. 33. On February 7, 2022, Respondent filed expert reports from James Teener, M.D., and Ross Kedl, Ph.D. Resp't's Ex. A, ECF No. 36; Resp't's Ex. B, ECF No. 37. Respondent filed medical literature on April 15, 2022. Resp't's Ex. A, Tabs 1–5, Resp't's Ex. B, Tabs 1–28, ECF No. 39. On June 13, 2022, Petitioner filed a supplemental report from Dr. Nahm and medical literature. Pet'r's Exs. 14–14.4, ECF No. 40. Respondent filed supplemental reports from Drs. Teener and Kedl and medical literature on September 28, 2022. Resp't's Ex. C, Tabs 1–2, Resp't's Ex. D, ECF No. 41.

Petitioner elected to resolve entitlement with a ruling on the record. *See* ECF Nos. 44–45. On September 19, 2024, Petitioner filed a motion for a ruling on the record. Pet'r's Mot., ECF No. 48. That same day, Petitioner filed Veterans Affairs ("VA") disability records and prescriptions records. Pet'r's Exs. 15–16, ECF No. 47. Respondent filed a response on December 3, 2024, and Petitioner filed a reply on December 10, 2024. Resp't's Response, ECF No. 50; Pet'r's Reply, ECF No. 51. This matter is now ripe for consideration.

## II.      Factual Background

### A.  Medical Records

Petitioner received the Tdap, meningococcal MCV40, varicella, adenovirus type 4, and adenovirus type 7 vaccines at Branch Health Clinic on April 13, 2018. Pet'r's Ex. 1 at 5.

On April 21, 2018, Petitioner presented to Branch Health Clinic for nausea, vomiting, and feeling weak for the past day. Pet'r's Ex. 2 at 36. He also complained of "feeling feverish," chills, nasal discharge, and a sore throat. *Id.* He reported congestion in his chest and feeling a "sharp pain in right side of chest every now and then when taking a deep breath." *Id.* Petitioner received intravenous ("IV") fluid and acetaminophen (Tylenol). *Id.* at 37–38. Labs were unremarkable. *Id.*

3

at 38–39. Petitioner underwent a chest X-ray, which was unremarkable, with no evidence of active pulmonary disease. *Id.* at 40. The assessment was nausea with vomiting and dehydration. *Id.* He was instructed to take ibuprofen and Zofran. *Id.* Petitioner returned to Branch Health Clinic on April 23, 2018, for "[f]ollow up [upper respiratory infection ("URI")]." *Id.* at 31. Petitioner reported "he ha[d] been taking his medication and fe[lt] 100% better." *Id.*

Petitioner returned to Branch Health Clinic on April 27, 2018, complaining of cold-like symptoms for the past two weeks. Pet'r's Ex. 2 at 24. His symptoms included cough, nasal congestion, runny nose, sore throat, shortness of breath, nausea, and vomiting. *Id.* Due to Petitioner reportedly vomiting six times in the past 24 hours, imaging of his abdomen was obtained to rule out any abnormalities. *Id.* at 26–27. The impression was "[n]onobstructed bowel gas pattern" and "[b]ilateral lower lobe pneumonia." *Id.* at 27. An X-ray of Petitioner's chest also showed findings consistent with left lower lobe pneumonia. *Id.* at 27–28. Dr. John Cowgar diagnosed Petitioner with pneumonia and prescribed azithromycin, Mucinex, nasal spray, and throat lozenges. *Id.* at 28. Petitioner returned for follow-up on May 1, 2018, and reported "feeling 100% better." *Id.* at 19.

Twenty-four days post vaccination, on May 7, 2018, Petitioner presented to Branch Health Clinic with complaints of numbness in his fingertips, feet, and mouth for the past week. Pet'r's Ex. 2 at 11. He also had "pinpoint lower back pain," which began the day before, and reported "difficulty swallowing and walking due to the numbness." *Id.* He complained of "total body weakness" and that it "t[ook] more energy to do things." *Id.* "Motor disturbances and gait abnormality" was also noted. *Id.* Petitioner was sent to Beaufort Memorial Hospital for further testing. *Id.* at 14.

That same day, May 7, 2018, Petitioner was admitted to Beaufort Memorial Hospital for evaluation by neurology with symptoms of abnormal gait as well as numbness and tingling in his lips, hands, and feet. Pet'r's Ex. 3 at 504. Nursing notes stated that Petitioner presented for "evaluation of numbness to his mouth, bilateral feet, and fingertips [with] onset [one] week prior to arrival." *Id.* at 508. He also complained of lower back pain. *Id.* "Consult[ation] with the physician at Naval Hospital reported the patient's gait was 'robotic-like.'" *Id.* Petitioner reported "he was treated for left lower lobe pneumonia with Azithromycin for [one] week" and that "these symptoms started when he was taking Azithromycin." *Id.* He denied "any continued cough or URI symptoms as he was 'cleared'" to go back to training. *Id.* Petitioner underwent magnetic resonance imaging ("MRI") of the brain and spine which were "within normal limits except for enlargement of the pineal gland." *Id.* at 505. Petitioner also underwent a lumbar puncture which "showed very high protein and suspicion for [GBS]." *Id.* at 505; *see also id.* at 75, 679 (elevated protein of 315 mg/dL, normal range 15-45 mg/dL). He was diagnosed with GBS and started on a four-day course of intravenous immunoglobulin ("IVIG"). *Id.* at 75.

During his hospitalization, Petitioner experienced constipation as noted on May 11, May 12, and May 14, 2018, and took MiraLAX as needed. Pet'r's Ex. 3 at 505, 522, 538, 686; Pet'r's Ex. 2 at 99, 112. On May 14, 2018, Petitioner was discharged from the hospital and admitted to in-patient rehabilitation where he completed 15 hours of "aggressive physical and occupational therapy." Pet'r's Ex. 3 at 7, 14. When he was discharged from acute rehabilitation on May 22, 2018, Petitioner was able to walk on his own but still reported weakness and tiredness in his legs.

4

*Id.* at 7. The nursing staff also assisted Petitioner with his constipation during rehabilitation, and he was taking Bisacodyl (Dulcolax). *Id.* at 496; Pet'r's Ex. 2 at 85.

Petitioner returned to Branch Health Clinic for a follow-up on May 23, 2018. Pet'r's Ex. 2 at 2. During this visit, it was noted that Petitioner was "now able to ambulate with recovery of leg strength. He has persistent paresthesias of his hands. The mouth and foot paresthesias have resolved. He walks unassisted." *Id.*

On May 24, 2018, 41 days post vaccination, Petitioner again returned to Branch Health Clinic for follow-up. Pet'r's Ex. 2 at 7.  It was noted that "he had residual numbness and tingling in his mouth and lips, hands and fingers, and feet. Reports all have resolved. Reports he has good balance and does not notice an[y] abnormalities left from the [diagnosis]." *Id.* "No further complaints at this time" was recorded. *Id.* Physician Assistant ("PA") Kimberly Eberhart noted that Petitioner had "made a good recovery" and that he "reported no residual issues or complaints." *Id.* at 9. She further stated that "[a]ll numbness and tingling have resolved" and that a neurological examination was unremarkable. *Id.* PA Eberhart documented, "[n]o follow up needed." *Id.*

On April 28, 2019, 11 months since his last appointment and over one year after his vaccination, Petitioner presented to the South Georgia Medical Center Emergency Department ("SGMC ED") with flu-like symptoms for the past three to four days. Pet'r's Ex. 6 at 3–6, 11. Petitioner complained of fever, sore throat, nasal drainage, vomiting, and night sweats. *Id.* at 6, 11. It was reported that Petitioner had a "past medical history of [GBS]." *Id.* at 11. Petitioner's physical examination, including a neurologic examination, was normal with exception of sinusitis symptoms. *Id.* at 5. Petitioner's rapid flu test was negative, and he was prescribed acetaminophen and amoxicillin. *Id.* at 11, 14.

On March 6, 2020, Petitioner was seen at the Lowndes County Health Department with "constipation problems since being diagnose[d] with [GBS]." Pet. Ex. 5 at 1. Petitioner's examination, including neurologic and musculoskeletal examinations, was normal. *Id.* Petitioner was encouraged to follow up with a primary care physician ("PCP") or local clinic "pertaining to his GBS, constipation[,] and rash."[5] *Id.* at 2.

On August 30, 2020, Petitioner presented to SGMC ED for muscle pain. Pet'r's Ex. 11 at 4. ED notes stated Petitioner presented for "tingling in fingers[,] toes[,] and face. Started today. . . . No weakness." *Id.* Nursing notes indicated an onset of one week. *Id.* at 5 (noting "chronic pain x1 week, worsening over 3–4 days"). Petitioner requested a test for GBS. *Id.* at 4. A lumbar puncture revealed elevated cerebrospinal fluid ("CSF") protein of 52 (normal range 15–45 mg/dL). *Id.* at 8.

Petitioner filed a prescription record indicating that he was prescribed Docusate for constipation on July 18, 2024. Pet. Ex. 16 at 2.

No other medical records were filed.

---

[5] Petitioner had a non-itching circular rash on his bilateral thighs and buttocks. Pet'r's Ex. 5 at 1. Petitioner reported it had been there for one month. *Id.*

## B. Affidavits

### 1. Petitioner

Petitioner submitted three affidavits. Pet'r's Exs. 4, 7–8. In his first affidavit, Petitioner explained his clinical course. *See generally* Pet'r's Ex. 4. Petitioner stated that he received Tdap, meningococcal MCV40, varicella, and adenovirus type 4 and type 7 vaccines on April 13, 2018, at the Branch Health Clinic in Parris Island, South Carolina. *Id.* at ¶ 4. He stated that prior to these vaccinations, he did not have a history of neurological disorders. *Id.* at ¶ 3. Petitioner detailed his medical visits from April 21, 2018, to May 24, 2018, consistent with the medical records outlined above. *Id.* at ¶¶ 10–18. On May 24, 2018, Petitioner recalled undergoing a physical examination for his military separation. *Id.* at ¶ 19. From this physical, it was determined he was to be separated from the United States Marine Corps ("USMC") for Convenience of the Government ("COG") based on his GBS diagnosis. *Id.* Petitioner asserted that as of the date of this affidavit (October 15, 2019), "residual tingling and cramping in [his] hands has returned, which impacts [his] ability to drive, cook[,] and work." *Id.* at ¶ 20. Aside from his April to May 2018 visits to Branch Health Clinic, Petitioner declared he "ha[s] not and do[es] not currently see a [PCP]." *Id.* at ¶ 22.

Petitioner's second affidavit outlined his employment history. *See generally* Pet'r's Ex. 7. He was employed by the USMC from April 9, 2018, to June 4, 2018. *Id.* at ¶ 9. Petitioner attested that "for a short and temporary period of time in 2018" he was insured by the USMC. *Id.* at ¶ 11. He did not have any other supplemental insurance from 2015 to 2018. *Id.*

Petitioner's third affidavit further detailed his military history and its connection to his injury and treatment. *See generally* Pet'r's Ex. 8. In April 2018, Petitioner enlisted in the USMC. *Id.* at ¶ 10. He "was particularly attracted to a lifetime of service in the Marine Corps because of benefits like a steady income, health insurance[,] and the GI Bill." *Id.* at ¶ 12. As part of his introduction to the USMC, Petitioner was required to go to basic training at Parris Island. *Id.* at ¶ 13. As part of his training, he had to undergo a medical evaluation during which it was determined he needed several vaccinations. *Id.* at ¶¶ 14–15. His vaccination, clinical course, and GBS diagnosis are outlined in his first affidavit. *See* Pet'r's Ex. 4. "Because of [his] GBS diagnosis, [Petitioner] was unable to complete the required Marine Corps training." Pet'r's Ex. 8 at ¶ 18. Petitioner was discharged from the USMC for COG. *Id.* at ¶ 19. Petitioner attested that based on his discharged status of COG, he is "unable to seek care/treatment from VA medical centers. In fact, [he has] been turned away when attempting to obtain medical treatment from VA medical centers." *Id.* at 2 n.1. Since his military discharge, Petitioner has worked various hourly paying jobs that do not provide health insurance. *Id.* at ¶ 20. Petitioner attested he has been unable to afford private health insurance and does "not make sufficient income to afford treatment with the medical professionals or therapists that [he] need[s] for [his] GBS." *Id.* at ¶ 21. Petitioner reiterated he continues "to suffer from tingling and cramping since [his] GBS diagnosis through multiple parts of [his] body. [He has] not consulted with any other medical professionals or therapists for the reasons stated above." *Id.* at ¶ 22.

### 2. Nikkolas Jackson

On December 4, 2020, Nikkolas Jackson ("Mr. Jackson") executed an affidavit. Pet'r's Ex. 9 at 2. Mr. Jackson stated he is the roommate and "longtime friend" of Petitioner. *Id.* at ¶ 2. Mr. Jackson met Petitioner in 2012 and became roommates in 2016. *Id.* at ¶¶ 3–6. Mr. Jackson attested that "[t]o this day, [Petitioner] continues to suffer symptoms from his vaccine-induced [GBS]." *Id.* at ¶ 7. He has personally witnessed or has knowledge that Petitioner continues to suffer from "[n]umbness and tingling in his fingertips and toes, . . . [c]ramping in his hands and wrists," lower back pain, and exhaustion. *Id.* at ¶ 8. He has also personally witnessed Petitioner being unable to partake in driving and lifting. *Id.* at ¶ 9. He stated, "occasionally [Petitioner] asks [Mr. Jackson] to drive him when he is not feeling well," and that "on some occasions, [Petitioner was] unable to assist with lifting heavy appliances which [they] recently had to do when [they] moved into [their] current apartment." *Id.*

### C. VA Disability Records

Petitioner filed a copy of the VA disability decision in support of his position. *See* Pet'r's Ex. 15; Pet'r's Mot. at 7–10. The decision indicates Petitioner served in the Marine Corps from April 9, 2018, to June 4, 2018. Pet'r's Ex. 15 at 13. His original disability claim was received on February 22, 2021, and a decision was made on April 30, 2021. *Id.* The decision was a 100% disability rating effective February 22, 2021, for "[s]ervice connection for [GBS]" that was "established as directly related to military service." *Id.* at 13–14. A 100% rating for his GBS was based on "[a]cute, with frequent exacerbations, producing severe impairment of health." *Id.* at 14. The decision also reasoned that

> [o]n the medical opinion, dated April 27, 2021, examiner states that "there is evidence of chronicity and a nexus has been established," which supports the exam[ination] assessment that [] your condition is chronic, rather than acute. On the examination, dated April 27, 2021, the examiner does indicate that you experience more than [three] exacerbations, lasting a week or more, representative of frequent exacerbations of your condition. The examiner also indicates that your condition does currently produce severe impairment of health. As such, it is determined that the current level of severity of your condition most closely approximates the 100 percent level of impairment, based on review of the totality of the evidence of record.

*Id.*

7

### D. Experts

#### 1. Expert Qualifications[6]

##### a. Dr. Frederick Nahm, M.D., PhD.

Dr. Nahm is board certified in psychiatry and neurology. Pet'r's Ex. 12 at 1. He has "17 years of clinical experience in neurology with fellowship training in clinical neurophysiology and neuromuscular medicine." *Id.* His fellowship in clinical neurophysiology "included both clinical and research activities related to autonomic dysfunction." *Id.* He has diagnosed patients with GBS and has "firsthand knowledge of both the clinical features and the clinical course related to this condition." *Id.* at 2.

##### b. Dr. James Teener, M.D.

Dr. Teener is board certified in neurology and neuromuscular disease. Resp't's Ex. A at 1. He is currently a Professor of Neurology at the University of Michigan where he is also the director of the Neuromuscular Program. *Id.* In this role, he "care[s] for patients, teach[es] neurology residents and neuromuscular fellows, conduct[s] research[,] and perform[s] administrative duties." *Id.* He has cared for numerous patients with GBS. *Id.*

##### c. Dr. Ross Kedl, Ph.D.

Dr. Kedl received his Ph.D. in Pathobiology from the University of Minnesota. Resp't's Ex. B at 1. He is currently a Professor of Immunology at the University of Colorado. *Id.* Prior to that, he worked as a senior immunologist at 3M Pharmaceuticals in their Immune Response Modifier program. *Id.* at 2. He "ha[s] maintained an NIH funded research program centered on the biology of vaccine adjuvants and their capacity to induce robust and enduring cellular immunity." *Id.* at 1. Throughout his career, Dr. Kedl has authored or co-authored over 100 publications, "the vast majority of which have been focused on vaccine adjuvants and the mechanisms by which they induce adaptive (T and B cell) immunity." *Id.* at 2.

#### 2. Expert Reports

##### a. GBS Sequalae

###### i. Dr. Nahm

Dr. Nahm submitted an initial expert report to specifically show how "[gastrointestinal ("GI")] dysfunction, like constipation, can result from GBS." Pet'r's Ex. 12 at 3. He cited Low et

---

[6] No CVs were filed for any of the experts. The qualifications are taken from each experts' first report.

al.,[7] Zochodne,[8] Zaeem et al.,[9] and Vernino et al.[10] "to present literature discussing the association between GBS and GI dysfunction." *Id.* (citing Pet'r's Exs. 12.1–12.4).

Low et al. discussed the "clinical parallels between autoimmune autonomic neuropathy[11] and [GBS]." Pet'r's Ex. 12.3 at 1. "There is [] significant overlap between these two disorders, as some degree of autonomic failure is present in most patients with GBS." *Id.* at 1–2. The authors wrote that "[a]utonomic neuropathy of some degree, particularly involving cardiovascular and gastrointestinal function, is found in two thirds of [GBS] patients and may be a life-threatening complication of the disease." *Id.* at 4. "Typically, autonomic neuropathy in GBS improves in concert with improvement in motor and sensory nerve function. Long-term autonomic sequalae are not typical." *Id.*

Zochodne reviewed literature on autonomic neuropathy in GBS and proposed "a management scheme to accommodate it in the overall treatment of the neuropathy." Pet'r's Ex. 12.2 at 1. "[O]ne or more features of autonomic neuropathy develop in the majority of GBS patients." *Id.* These mainly include cardiovascular symptoms. *Id.* at 1–5. Zochodne added that a "number of other autonomic abnormalities have been reported in GBS but they appear to be relatively infrequent." *Id.* at 5. These include constipation. *Id.* The author commented that constipation is "most safely treated with stool softeners to prevent arrhythmia." *Id.* at 8–9.

Zaeem et al. reviewed literature suggesting that GBS is associated with autonomic dysfunction, including GI motility dysregulation, in up to two-thirds of patients. Pet'r's Ex. 12.1 at 1. They explained the "intimate supply of the GI tract with autonomic parasympathetic and sympathetic nerves can be targeted by GBS." *Id.* at 4. "The vagus nerve provides parasympathetic supply to the colon, small intestine, and stomach. The distal colon receives parasympathetic supply from sacral parasympathetic fibers. The splanchnic and the lumbar colonic nerves provide sympathetic supply to the colon, small intestine, and stomach." *Id.* While paralytic ileus, gastroparesis, delayed gastric emptying, diarrhea, and fecal incontinence have been described in patients with GBS, because "many patients with severe GBS require ICU admission, it is unclear whether associated ileus is secondary to dysautonomia or immobility and use of pharmacological treatments such as opioids." *Id.* "The contribution of autonomic dysfunction to intestinal paralysis is difficult to differentiate from the confounding effects of mechanical ventilation, immobility, and medications (e.g. narcotics) in these patients." *Id.* The authors pointed out that few cases series

---

[7] Phillip A. Low et al., *Autonomic Dysfunction in Peripheral Nerve Disease*, 27 MUSCLE & NERVE 646 (2003).

[8] Douglas W. Zochodne, *Autonomic Involvement in Guillain-Barré Syndrome: A Review*, 17 MUSCLE & NERVE 1145 (1994).

[9] Zoya Zaeem et al., *Autonomic Involvement in Guillain-Barré Syndrome: An Update*, 29 CLINICAL AUTONOMIC RSCH. 289 (2019).

[10] Steven Vernino et al., *Autoantibodies to Ganglionic Acetylcholine Receptors in Autoimmune Autonomic Neuropathies*, 343 NEJM 847 (2000).

[11] Autonomic neuropathy is "any neuropathy of the autonomic nervous system, causing symptoms such as orthostatic hypotension, disordered bowel, bladder, or sexual functions, or abnormal pupillary reflexes." *Autonomic Neuropathy*, DORLAND'S. The autonomic nervous system is "the portion of the nervous system concerned with regulation of the activity of cardiac muscle, smooth muscle, and glandular epithelium; usually restricted to the two visceral efferent peripheral components, the sympathetic nervous system, and the parasympathetic nervous system." *Autonomic Nervous System*, DORLAND'S.

have addressed autonomic mechanism underlying bowel function in GBS and laboratory testing is lacking. *Id.* at 5. As to the long-term effect, Zaeem et al. performed comprehensive autonomic testing three to eight years after GBS onset. *Id.* at 8. They found that in mild cases of GBS, "most sympathetic and parasympathetic indices tend to improve over time, leading to the conclusion that subclinical autonomic dysfunction is common in GBS, though it is temporary and resolves spontaneously." *Id.* In other words, most studies showed that clinical autonomic dysfunction after GBS is transient and resolves over time," and "no clinically significant residual autonomic dysfunction" was reported in studies after one year. *Id.*

Lastly, Dr. Nahm cited Vernino et al. for the proposition that "high levels ganglionic nicotinic acetylcholine receptor (AChR) antibodies [are found] in people with autonomic neuropathy" and this is an "important clue to the autoimmune pathogenesis of autonomic neuropathy." Pet'r's Ex. 12 at 3–4. Vernino et al. found "[h]igh levels of the binding antibodies correlated with more severe autonomic dysfunction." Pet'r's Ex. 12.4 at 1.

According to Dr. Nahm, this literature shows that "[GI] dysfunction, including but not limited to constipation, gastroparesis, GI dysmotility, are neither rare, nor uncommon in people with GBS." Pet'r's Ex. 12 at 5.

In a supplemental report, Dr. Nahm specifically opined that Petitioner "had greater than [six] months of GBS related symptoms as attested to by his constipation." Pet'r's Ex. 13 at 18. "While gastrointestinal symptoms are much less commonly recognized than sensory or motor symptoms in people with GBS, it can occur as a result of autonomic nervous system involvement and dysfunction." *Id.* at 18–19.

In a final supplemental report, Dr. Nahm cited additional literature to show an association between GBS and GI dysfunction. Pet'r's Ex. 14 at 3. The first article, Anandan et al.,[12] found that GI complications "(alternating diarrhea/constipation)" were found in 15.5% of patients with GBS during hospitalization. Pet'r's Ex. 14.3 at 2. However, the authors noted a limitation to their study was that "preexisting illnesses might have been coded in the diagnosis, thus at best it offers associations and cannot demonstrate cause and effect." *Id.* at 2.

The second article, Arsenijevic et al.,[13] which acknowledged that autonomic dysfunction occurs in approximately two-thirds of GBS patients in the acute phase of the disease, conducted a study "to determine the frequency of self-reported autonomic disorders in GBS patients three and six months after disease onset compared to healthy controls." Pet'r's Ex. 14.4 at 1. The study involved a self-completed questionnaire by 70 GBS patients to measure their autonomic functions. *Id.* at 2. They used a scoring system for each autonomic function ranging from zero (never experiencing a symptom) to three (often experiencing a symptom). *Id.* Patients took the questionnaire at three months and six months post-GBS onset. *Id.* While the overall autonomic impairment in GBS patients was worse compared to healthy controls at month three, "no statistically significant difference in the [scores] was observed between GBS patients and controls

---

[12] Charenya Anandan et al., *Prevalence of Autonomic Dysfunction in Hospitalized Patients with Guillain-Barré Syndrome*, 56 MUSCLE & NERVE 331 (2017).

[13] Mirjana Arsenijevic et al., *Self-Reported Autonomic Dysfunction in a Recovery Phase of Guillain-Barré Syndrome*, 201 CLINICAL NEUROLOGY & NEUROSURGERY 106427 (2021).

[six] months after diseases onset." *Id.* GI function was frequently impaired in GBS patients compared to controls. *Id.* at 3. "Complications to pass stool and constipation were frequent after three months from disease onset." *Id.* at 2. "These problems resolved over time in one part of GBS patients, but even after six months significant percentage of GBS patients had constipation." *Id.* at 3. The authors noted however that a vast majority of the patients, although ambulatory, had "some mobility problems that may at least partially contribute to their constipation." *Id.* The authors noted that autonomic dysfunction in patients with mild forms of GBS "improved gradually during three months, and there was no clinically significant autonomic dysfunction after one year." *Id.* at 1. Arsenijevic et al. concluded that "[a]utonomic symptoms are common in GBS patients during the recovery phase" although the symptoms are "more pronounced in patients with axonal forms of GBS and a higher degree of functional disability." *Id.* at 4.

Dr. Nahm opined that the data from Anandan et al. and Arsenijevic et al. "support the view that as far as components of dysautonomia from GBS, constipation (as was reported by the [P]etitioner) is the most commonly reported symptom." Pet'r's Ex. 14 at 3.

### ii.    Dr. Teener

Dr. Teener agreed that Petitioner had GBS, albeit a "mild case." Resp't's Ex. A at 3. He opined Petitioner "very likely had the GBS subtype, [acute inflammatory demyelinating polyneuropathy ("AIDP")], the most common form of GBS" in which the "primary immune attack is on the myelin sheath, which is amenable to rapid and effective repair." *Id.* He reasoned this because Petitioner "had a rapid improvement in symptoms." *Id.* Dr. Teener opined that Petitioner "made an excellent recovery, and has no significant long-term sequelae." *Id.* at 6. Dr. Teener summarized that after Petitioner's discharge on May 14, 2018, "he experienced rapid, and by his report, complete resolution of symptoms." *Id.* at 3. "By the time of his follow up visit at the base clinic on May 24, 2018, [Petitioner] reported that his paresthesias was gone. He did not require any further treatment for neuropathic pain or constipation following his last visit to the base medical clinic on May 24, 2018." *Id.*

Dr. Teener acknowledged Petitioner's March 6, 2020 visit to Lowndes County Health Department where he reported a rash and constipation. Resp't's Ex. A at 5. But Dr. Teener pointed out that the "examination was benign, and no medications were prescribed for the constipation." *Id.* Dr. Teener also noted Petitioner's April 28, 2019 ED visit where "there was no mention of constipation and there was no indication that he was taking medication for constipation." *Id.* Dr. Teener also mentioned the August 30, 2020 ED visit where Petitioner presented for evaluation of numbness and tingling; but "[a]gain, there was no mention of constipation, no indication of any treatment for constipation, and he specifically denied any abdominal pain." *Id.* Even as early as the follow-up visit at the base clinic immediately following Petitioner's discharge from acute rehab on May 24, 2018, "there was no indication that he was experiencing constipation. In the record of this visit, there is a specific report of a review of systems that indicates no reported constipation." *Id.* (citing Pet'r's Ex. 2 at 3). Moreover, Dr. Teener noted no treatment for constipation was prescribed or discussed. *Id.*

According to Dr. Teener, "[t]hese records provide clear evidence that any constipation experienced by the Petitioner was intermittent and mild. In [his] experience with GBS patients,

11

chronic constipation is not a common complaint." Resp't's Ex. A at 5. In contrast, he wrote that "[m]ost people experience constipation at some point in their lives, and there is no evidence of excessive constipation for the Petitioner." *Id.* at 5–6. Higgins & Johanson[14] found that 12 to 19% of the general population experience constipation. Resp't's Ex. A, Tab 5 at 1. Dr. Teener understood Dr. Nahm's contention to be that Petitioner "suffered prolonged autonomic dysfunction." *Id.* at 6. Dr. Teener saw no evidence of dysautonomia in the medical records. *Id.* He stated that "[a]lthough constipation can be a feature of dysautonomia, when constipation is seen in isolation, it is not often a sign of dysautonomia. Numerous other GI complaints such as gastroparesis, ileus, delayed gastric emptying, diarrhea and incontinence are more typically indicative of dysautonomia." *Id.* Dr. Teener stated that "[n]one of these other GI symptoms were present at any time" for Petitioner. *Id.*

Further, Dr. Teener pointed out that although Petitioner reported "a recurrence of tingling and cramping in his hands," because Petitioner "reported no such symptoms on several occasions of medical follow-up in the days following the GBS diagnosis, the development of such symptoms more than a year later is not due to the episode of GBS." Resp't's Ex. A at 6.

In a supplemental report, Dr. Teener responded to Dr. Nahm's additional opinions on Petitioner's constipation. Resp't's Ex. C at 1–2. Dr. Teener pointed out that although Anandan et al. indicated 15% of GBS patients experience the combination of diarrhea and/or constipation, the incidence of constipation in isolation was 5.4%. *Id.* at 1 (citing Pet'r's Ex. 14.3). According to Dr. Teener, "[t]his rate in the control population is quite low compared to other studies that have found the prevalence of constipation in the general population to be 20%." *Id.* at 1–2 (citing Resp't's Ex, C, Tab 1;[15] Resp't's Ex. C, Tab 2).[16] Dr. Teener also mentioned Arsenijevic et al. which found there was no increase in autonomic dysfunctions in GBS patients compared to the control population. *Id.* at 2 (citing Pet'r's Ex. 14.4). "They also found that autonomic dysfunction was more likely to be present in severely affected GBS patients. The [P]etitioner had a very mild case of GBS." *Id.*

### b. Causation

Dr. Nahm opined "the tetanus vaccine could have triggered an immune cross-reaction through molecular mimicry and T cell activation leading to an immune/inflammatory response to antigens affecting the peripheral nerves and myelin leading to GBS." Pet'r's Ex. 13 at 20. He opined Petitioner's development of GBS was 18 days post vaccination which "is in keeping with the 3–42 day period of symptom onset of GBS as listed in the Vaccine Injury Table." *Id.*

Dr. Teener noted Petitioner had an infectious illness in the days prior to him developing GBS. Resp't's Ex. A at 4. He opined there is no reliable evidence that the Tdap vaccine causes GBS and opined Petitioner's cases is a "classic case of post-infectious GBS." *Id.* at 5. Dr. Kedl

---

[14] Peter D.R. Higgins & John F. Johanson, *Epidemiology of Constipation in North America: A Systematic Review*, 99 AM. J. GASTROENTEROLOGY 750 (2004).

[15] Barry L. Werth et al., *Defining Constipation to Estimate its Prevalence in the Community: Results from a National Survey*, 19 BMC GASTROENTEROLOGY 75 (2019).

[16] Maria Vazquez Roque & Ernest P. Bouras, *Epidemiology and Management of Chronic Constipation in Elderly Patients*, 10 CLINICAL INTERVENTIONS AGING 919 (2015).

similarly opined that "the 2+ week bout of pneumonia experienced by [Petitioner] can easily serve as the foundation for a 'more likely than not' theory of causation." Resp't's Ex. B at 15.

In response to Respondent's experts, Dr. Nahm opined "there is no evidence in the medical record to support the presence of the most commonly reported GBS-related infectious agents." Pet'r's Ex. 14 at 2.

## III.　Discussion

### A.　Standards of Adjudication: Six-Month Severity

Petitioners not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section 11(c)(1)(D); *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011).

It is the petitioner's burden to prove his case, including the six-month severity requirement, by a preponderance of the evidence. *Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994). A petitioner cannot establish the length or ongoing nature of an injury solely through his or her own statements, but rather is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months." *Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995), *aff'd*, 93 F.3d (Fed. Cir. 1996).

While even mild symptoms that do not require intensive medical care may satisfy the severity requirement, ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not. *Compare Wyatt v. Sec'y of Health & Hum. Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (petitioner's post-vaccination GBS resolved within three months; subsequent ongoing medical treatment for upper respiratory and gastrointestinal infections did not satisfy six-month requirement), *with Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (ongoing mild GBS symptoms that did not require active medical care nevertheless satisfied severity requirement).

### B.　Standards of Adjudication: Causation

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the timeframe prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that petitioner suffered an "off-Table injury," one not listed on the Table, as a result of his receiving a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319-20 (Fed. Cir. 2006). Petitioner does not allege a Table injury in this case. Thus, he must prove either that his injury was caused-in-fact by a Table vaccine.

13

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. 42 U.S.C. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)).

In the seminal case of *Althen v. Sec'y of the Dept. of Health & Hum. Servs*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d at 1278–79. The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *See id.*

## C. Analysis: Six-Month Severity

Petitioner's medical records indicate that he received the Tdap vaccination at issue on April 13, 2018, and that he began experiencing symptoms of GBS on or around May 1, 2018. Petitioner was admitted to the hospital on May 7, 2018, and discharged on May 14, 2018, following IVIG treatment. Petitioner was subsequently admitted to in-patient rehabilitation on May 14, 2018, and discharged on May 22, 2018. At his discharge he was noted to be able to walk on his own but still reported weakness and tiredness in his legs.

In order to establish by preponderant evidence that his injury lasted for at least six months, Petitioner must show that he continued experiencing the residual effects of his injury until November 2018, but Petitioner's medical records fail to provide preponderant evidence that he was experiencing symptoms beyond May 2018.

### 1. Tingling

At a follow-up visit on May 23, 2018, Petitioner was able to ambulate unassisted; his mouth and foot paresthesias resolved, but his hand paresthesias remained. Pet'r's Ex. 2 at 2. The following day, May 24, 2018, 41 days post vaccination, follow-up notes indicated Petitioner "had residual numbness and tingling in his mouth and lips, hands and fingers, and feet. Reports all have resolved. Reports he has good balance and does not notice an[y] abnormalities left from the [diagnosis]." *Id.* at 7. "No further complaints at this time" was recorded. *Id.* PA Eberhart noted that Petitioner had "made a good recovery" and that he "reported no residual issues or complaints." *Id.* at 9. She further stated that "[a]ll numbness and tingling have resolved" and that a neurological examination was unremarkable. *Id.* PA Eberhart documented, "[n]o follow up needed." *Id.*

More than two years later, on August 30, 2020, Petitioner presented to the ED for muscle pain and tingling in his fingers, toes, and face for one week. Pet'r'rs Ex. 11 at 4–5. A lumbar puncture was normal.

14

The medical records do not provide preponderant evidence that Petitioner suffered GBS for more than six months. Instead, the contemporaneous records reflect that Petitioner recovered from his GBS. While there are records from 2020 that reference tingling issues, there is no preponderant evidence that it is from his GBS.

In his first affidavit (October 15, 2019), Petitioner asserted "residual tingling and cramping in [his] hands ha[d] returned." Pet'r's Ex. 4 at ¶ 20. His third affidavit, dated December 4, 2020, also stated that he continues "to suffer from tingling and cramping since [his] GBS diagnosis through multiple parts of [his] body." Pet'r's Ex. 8 at ¶ 22. Petitioner explained that due to insurance issues, he has not consulted with medical professionals for these issues since May 2018. Petitioner also filed an affidavit from his roommate attesting to Petitioner's numbness, tingling, and cramping he witnessed as of December 2020. *See* Pet'r's Ex. 9.

While Petitioner's explanation for not seeking care is reasonable and I am sympathetic to his situation, Petitioner's lack of insurance did not deter him from seeking medical attention in April 2019 when he was experiencing flu-like symptoms. Additionally, he did not indicate that he obtained insurance later in 2020 when he did seek medical care in March and August of that year. Although affidavit evidence can be helpful to provide contextual details for symptomology, chronology, and severity, this kind of testimonial evidence, especially when recounted after a substantial passage of time, is less probative when it is countered by contrary evidence in the medical record. *See, e.g.*, *Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993); *see also Uetz v. Sec'y of Health & Hum. Servs.*, No. 14-29V, 2014 WL 7139803, at *3–4 (Fed. Cl. Spec. Mst. Nov. 21, 2014) (finding affidavits contrary to the contemporaneous medical record did not establish a finding that the six-month requirement had been satisfied); *Vogler v. Sec'y of Health & Hum. Servs.*, No. 11-424V, 2014 WL 1991851, at *4, 8–10 (Fed. Cl. Spec. Mstr. Apr. 25, 2014) (recognizing that filed affidavits can "bulwark" a claim that an injury meets the six-month requirement, but not in the face of a medical record to the contrary). Here, the medical records indicate Petitioner "made a good recovery" with no residual complaints. Pet'r's Ex. 2 at 9. Petitioner did not submit additional evidence that persuasively explained if the 2019 tingling symptoms described in his affidavit and reported to medical providers in 2020 was residual of his GBS. Pet'r's Ex. 4 at ¶ 20.

### 2. Constipation

To further support his severity contention, Petitioner argues that constipation is sequala of GBS, and that Petitioner suffered from this for more than six months.

Dr. Nahm opined "GI dysfunction, like constipation, can result from GBS" and that Petitioner "had greater than [six] months of GBS related symptoms as attested to by his constipation." Pet'r's Ex. 12 at 3; Pet'r's Ex. 13 at 18. Dr. Teener opined Petitioner "made an excellent recovery of his GBS and "has no significant long-term sequalae." Resp't's Ex. A at 6. Dr. Teener also opined that to the extent constipation is present in GBS patients, it is usually not the case in mild cases such as Petitioner's. Dr. Teener added that constipation is common among the general population and that chronic constipation is not a common complaint in GBS patients.

The consensus in the literature filed is that approximately two-thirds of GBS patients have some degree of autonomic dysfunction, including gastrointestinal symptoms. *See* Pet'r's Ex. 12.3 at 4; Pet'r's Ex. 12.1 at 1; Pet'r's Ex. 14.4 at 1.

However, this dysfunction is mainly observed during the acute phase of the disease and commonly resolves when GBS symptoms resolve. Arsenijevic et al. noted that autonomic dysfunction in patients with mild forms of GBS "improved gradually during three months, and there was no clinically significant autonomic dysfunction after one year." Pet'r's Ex. 14.4 at 1. They also noted symptoms were more pronounced in patients with axonal forms of GBS and a higher degree of functional disability. Low et al. wrote that "typically, autonomic neuropathy in GBS improves in concert with improvement in motor and sensory nerve function. Long-term autonomic sequalae are not typical." Pet'r's Ex. 12.3 at 4. Zaeem et al. performed comprehensive autonomic testing three to eight years after GBS onset. Pet'r's Ex. 12.1 at 8. They found that in mild cases of GBS, "most sympathetic and parasympathetic indices tend to improve over time, leading to the conclusion that subclinical autonomic dysfunction is common in GBS, though it is temporary and resolves spontaneously." *Id.* In other words, most studies showed that "clinical autonomic dysfunction after GBS is transient and resolves over time," and "no clinically significant residual autonomic dysfunction" was reported in studies after one year. *Id.*

This is evidenced here where although Petitioner experienced constipation during his admissions, there were no reports of any kind of GI dysfunction in his follow-up visits. During his hospitalization, Petitioner experienced constipation as noted on May 11, May 12, and May 14, 2018, and took MiraLAX as needed. Pet'r's Ex. 3 at 505, 522, 538, 686; Pet'r's Ex. 2 at 99, 112. On May 12, 2018, Dr. Tuthill noted that "[GBS] has been known to give some autonomic abnormalities." Pet'r's Ex. 2 at 103. She documented Petitioner's constipation but that there were "[n]o alarming symptoms." *Id.* Petitioner also experienced constipation during in-patient rehabilitation from May 14 to May 22, 2018. *Id.* at 85; Pet'r's Ex. 3 at 496. However, in Petitioner's follow-up visit on May 23, 2018, "no constipation" was listed in review of symptoms. Pet'r's Ex. 2 at 3. And Petitioner's April 28, 2019 ED visit did not mention constipation or list any medications for constipation. Moreover, Dr. Teener opined Petitioner likely had the AIDP variant of GBS rather than an axonal form of GBS due to his rapid recovery. Resp't's Ex. A at 3. This is consistent with Petitioner's clinical presentation.

Almost two years after his discharge, on March 6, 2020, Petitioner presented to Lowndes County Health Department with "constipation problems since being diagnose[d] with [GBS]." Pet. Ex. 5 at 1. Physical examination was normal. There was no diagnosis and no medications prescribed for constipation. Petitioner was instructed to follow up with a PCP for his "GBS, constipation." *Id.* at 2. There is no indication Petitioner followed up with anyone for this issue. Petitioner also filed a prescription record for constipation medication (Docusate) dated July 18, 2024. However, it is unclear who prescribed this or how long it had been prescribed for.[17] Thus, from May 2018 to March 2020 there is no evidence of constipation. Petitioner argues the April 28, 2019 ED visit is evidence of GBS sequalae because the record included "past medical history of [GBS]." Pet'r's Ex. 6 at 11; *see* Pet'r's Mot. at 21. But GBS listed in medical history is not

---

[17] In his motion, Petitioner stated he received a "long term" supply of Docusate which was prescribed by a VA provider. Pet'r's Mot. at 8. Petitioner stated he unsuccessfully attempted to obtain the records. *Id.* There was no attempt to subpoena theses records.

evidence of ongoing symptoms of GBS or sequalae of GBS. Likewise, there is no evidence of constipation from March 2020 to July 2024. Petitioner asks that I rely on Petitioner's affidavits to show he meets the six-month severity requirement. However, in none of his three affidavits does Petitioner attest to his constipation at all.

Additionally, Petitioner argues the VA disability decision "speaks [for] itself and [] clearly acknowledges that [Petitioner's] GBS sequalae has lasted well over [six] months and even anticipates his condition and continuing sequalae to be permanent." Pet'r's Mot. at 24. However, there are several reasons why this is not reliable evidence here. First, the decision relied on a medical opinion from "VA contract examination (LHI), conducted April 27, 2021," which was not filed in this case. *See id.* at 14. Second, information in the VA disability decision is inconsistent with contemporaneous medical records. While they reasoned a 100% rating was assigned due to "[a]cute, with frequent exacerbations, producing severe impairment of health;" his condition being "chronic, rather than acute;" and that he "experienced more than [three] exacerbations, lasting a week or more," there are no medical records reporting any exacerbations, for any period of time that resulted in the severe impairment of health. *Id.* Moreover, there is no indication in the decision as to what type of symptoms Petitioner experienced in these alleged exacerbations. Third, the criteria used by the VA to make its disability determinations are not included in the decision or elsewhere in Petitioner's records. And finally, "VA Disability Rating Decisions are not binding on this Court, either by statute, regulation, or precedential case law." *Burgess v. Sec'y of Health & Hum. Servs.*, No. 17-688V, 2022 WL 17410582, at *28 (Fed. Cl. Spec. Mstr. Nov. 7, 2022).

I am aware that a variety of evidence can be used to satisfy issues like severity, and I am reluctant to dismiss a case simply on this basis, especially given the Program's emphasis on generosity in reaching entitlement decisions. *See Watts v. Sec'y of Health & Hum. Servs.*, No. 17-1494, 2019 WL 4741748, at *6 (Fed. Cl. Spec. Mstr. Aug. 13, 2019) (recognizing the generosity of the Vaccine Program and how this policy concern impacts interpretation of the Act's severity requirement). However, severity is a claim requirement, and cases may legitimately be dismissed if the record does not preponderantly reveal sufficient evidentiary support for this claim element. *See Prepejchal v. Sec'y of Health & Hum. Servs.*, No. 15-1302V, 2018 WL 5782865, at *15-16 (Fed. Cl. Spec. Mstr. Oct. 5, 2018) *mot. for review denied*, 141 Fed. Cl. 519 (2019) (finding petitioner's failure to satisfy the severity requirement as a basis for the claim's dismissal). Here, I have conducted a thorough record review in reaching my determination, and even giving Petitioner's witness statements some weight, I cannot find that severity is met.

### D.  Analysis: Causation

Because Petitioner failed to satisfy severity, a claim requirement, we do not reach the issue of causation.

IV.    **Conclusion**

Based on the record as a whole, Petitioner has failed to prove by preponderant evidence that his GBS or its residual effects lasted for more than six months. Accordingly, Petitioner has not established entitlement to compensation, and I must **DISMISS** his claim.[18]

        **IT IS SO ORDERED.**

                                        s/Herbrina D.S. Young
                                        Herbrina D.S. Young
                                        Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.